IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MONA GARNER, | ) | |
| | ) | |
| Plaintiff | ) | Case No. 14 C 2034 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| CLEARSTAFF, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mona Garner filed an amended five-count complaint against defendant Clearstaff, Inc. ("Clearstaff"), alleging that defendant discriminated against her based on race (Count I), sex (Count II), and age (Count V), retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 200e et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, (Count III) and failed to provide her with a reasonable accommodation pursuant to the ADA (Count IV). On June 10, 2015, plaintiff voluntarily dismissed Counts I and V of her amended complaint. Doc. no. 57. Defendant has filed the instant motion for summary judgment pursuant to Fed. R. Civ. P. 56, contending that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. For the reasons discussed below, the court grants defendant's motion.

### BACKGROUND[1]

**A.     Plaintiff's Allegations of Discrimination and Retaliation**

Defendant Clearstaff, Inc. is a staffing agency. In March 2003, defendant's owner/president, Richard Seeman, hired plaintiff, a female American Indian, as a sales

---

[1] The following facts are, unless otherwise specified, undisputed and come from the parties' Local Rule 56.1 statements and responses.

representative. Plaintiff alleges[2] that from 2006 to 2008, Jennifer Kelly, a Caucasian female coworker, made numerous offensive comments in her presence while at sales meetings and sales blitzes. In 2006, plaintiff allegedly overheard Kelly say to a group of sales representatives that she "knew that nigger bitch was not going to give us the f-ing business." Similarly, plaintiff alleges that in March 2007 she overheard Kelly say, in a voice imitating an African-American woman, to another sales representative,: "Oh yeah I'm gonna go get me some black eyed peas and chitlins. My name is Matilda." Plaintiff also alleges that in 2007 she overheard Kelly say to another sales representative that a coworker was a "nigger lover" and a "whigger." Plaintiff alleges that she complained to David Sparkman, a sales manager, about these comments, but that Sparkman did not take any corrective action.

Kelly also allegedly made at least six sexually-explicit comments or gestures in plaintiff's presence. In late 2007 or early 2008, Kelly allegedly said to a group of sales representatives during a sales meeting that they should "get some chapstick" so "when we give our blow jobs our lips won't get dry." Plaintiff also claims that during this time, Kelly made comments to the sales group about needing knee pads to "give blow jobs," and that after a

---

[2] The court notes that plaintiff did not submit any statements of fact as a part of its Rule 56.1 statement of additional facts concerning or describing the allegedly offensive comments at issue in this case. While plaintiff's response brief includes a fact section and various references to discriminatory/offensive comments, there are no record cites in plaintiff's brief to support these factual allegations. Accordingly, the court considers only the offensive comments and gestures described as a part of defendant's Rule 56.1 statement. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994) ("[T]he district court's role in deciding [a motion for summary judgment] is not to sift through the evidence," instead the parties "bear a concomitant burden to identify the evidence that will facilitate" its assessment of "whether there is any material dispute of fact that requires a trial."). The comments and gestures described by defendant, however, are contested because defendant refers to them in its Rule 56.1 statement as "plaintiff's allegations." Nevertheless, because defendant appears to accept the allegations about Kelly's comments and gestures as true for purposes of this motion, the court does the same.

meeting with a customer Kelly dusted off her knees and said "I took one for the team with that one." During this time, Kelly also allegedly made sexual gestures such as "giving a blow job." In January or February of 2008, Kelly allegedly told a group of sales representatives during a meeting that she did not wear underwear. Finally, plaintiff alleges that in January 2008, Kelly said to her in a voice imitating an African American woman: "I got me a big ol' black dick and I got a pimple on my pussy . . . and probably gonorrhea." Plaintiff allegedly informed Sparkman and Seeman about this comment, but no corrective action was taken. Kelly's comments, both racial and sexual, allegedly ended in the Spring of 2008.

Plaintiff alleges that she was retaliated against in numerous ways as a result of complaining about Kelly's offensive comments. According to plaintiff, in October 2007 she was transferred from defendant's Bensenville, Illinois office to its Chicago/North Pulaski office in retaliation for her complaints. As a result of the office transfer, plaintiff had a longer commute and a different sales territory. Plaintiff testified that in further retaliation Sparkman steered her clients to Kelly and unfairly forced her to split commissions with Kelly. Plaintiff also alleges that she was denied an office, laptop, phone, work area, and business cards, and was excluded from work and social events. From October 30, 2008, to November 16, 2009, plaintiff filed six discrimination charges with the Illinois Department of Human Rights, alleging that defendant was unlawfully discriminating and retaliating against her in violation of Title VII and the ADA.

**B.    Performance Issues**

Seeman testified that from 2003 to 2009 defendant expected sales representatives, like plaintiff, to secure half a million dollars in new sales each year. Seeman determines when a sales representative is placed on sales probation, known as a sales program. According to Seeman, the

3

half a million dollar goal is not an absolute cut-off, because "if a rep has a bad year [defendant] may look at" the representative's sales over a longer period of time, so "[t]here may be a year where someone made $490,000 or $380,000," but "[w]hen there are times that they are under $150,000 or $200,000 then they are in trouble."

Plaintiff understood that as a part of her position she would be terminated if she did not make adequate sales; however, she alleges that she did not know about the company's specific sales goal for each representative until August 2007. Plaintiff brought in $655,901 in new sales in 2004, $574,086 in new sales in 2005, $408,575 in new sales in 2006, and $300,000 in new sales in 2007. Defendant reported that plaintiff secured approximately $96,000 in new sales in 2008 and $156,610 in new sales in 2009.[3]

On August 9, 2007, Seeman and Sparkman informed plaintiff that she was being placed on a sales program as a result of her lack of new sales. As a part of the sales program, plaintiff was required to: (1) physically report to the office once a day, either at or before 8:00 a.m. or between 4:00 p.m. and 5:00 p.m.; (2) hand in a weekly log sheet of activity detailing the number of cold calls and telephone calls made each day and a list of appointments; (3) make at least 30 sales calls a day; (4) make a minimum of three contacts per day; (5) make a least four

---

[3] Plaintiff alleges that defendant failed to credit her with $175,382 in new sales in 2008, crediting Kelly with the sales instead. Plaintiff also alleges that defendant improperly credited another sales representative with a new account she secured in 2009. In April 2010, in response to three wage claims filed by plaintiff, the Illinois Department of Labor (the "IDL") found that defendant had violated the Illinois Wage Payment and Collection Act ("IWPCA") by failing to provide plaintiff with prior notice of certain commission splits and its new manner of calculating commissions beginning in 2009. As a result, the IDL awarded plaintiff an additional $2,276.13 in commissions related to accounts dating from March 2007 to June 2009.

appointments each week; (6) bring in at least three new accounts a month; and (7) fill orders for at least ten employees at new accounts.

Plaintiff testified that following this meeting, she informed Sparkman that she suffered from depression and anxiety, and requested to "have some leeway, work from home, make calls, do anything," and "put aside [the sales program] for a while." According to plaintiff, Sparkamn refused to provide her with these accommodations, stating that the "writing stands." Seeman and Sparkman met with plaintiff again on September 14, 2007, to inform her that her sales were still inadequate. Following that meeting, however, plaintiff's sales significantly improved and she was removed from the sales program in December 2007.

On March 21, 2008, Sparkman and Seeman met with plaintiff about "communication issues." According to a written reprimand[4] directed to plaintiff's personnel file, plaintiff was cited for, among other things, sending an inappropriate email to Sparkman that "bordered on insubordination," and being "verbally loud and heated in conversations in person, on email, and on the phone with other Clearstaff employees." The reprimand noted that plaintiff was informed that "if this continues or happens again her employment will be terminated." On October 14, 2008, Sparkman and Seeman issued a final written warning to plaintiff. According to the warning, on October 1, 2008, plaintiff initiated an incident with Kelly in which she was "excessively loud and heated." The warning states that plaintiff "acted in an intimidating manner," and that such behavior would not be tolerated. The warning notes that "[t]his is [plaintiff's] second and final warning." The warning indicates that plaintiff, Kelly, and two

---

[4] Plaintiff disputes that "the allegations contained in the memorandum are true facts" and "states that the incidents did not happen." However, the record cites that plaintiff provides do not support this contention.

other employees who were present during the dispute had been interviewed about the incident. Plaintiff, however, disputes that an altercation took place.

On March 31, 2009, Seeman and Sparkman met with plaintiff to discuss her lack of sales since January, informing her that she would be placed on another sales program if her sales did not improve. Either during or immediately following the meeting, plaintiff allegedly suffered an anxiety attack and requested that defendant call an ambulance. Plaintiff was taken by ambulance from defendant's office to the hospital. Plaintiff took leave from April 1, 2009, through April 14, 2009, returning to work on April 15, 2009, after her doctor cleared her to work full time without restrictions.

On July 20, 2009, Sparkman and Seeman informed plaintiff that she was being placed on a second sales program to help her increase her sales. The second sales program required plaintiff to comply with the same conditions as the first program. While still on the second sales program, plaintiff took leave from work pursuant to the Family Medical Leave Act ("FMLA") from September 1, 2009, through September 29, 2009. Plaintiff was cleared by her doctor to return to work on September 29 "on a part-time basis not to exceed 20 hours per week." The FMLA certification filled out by plaintiff's doctor indicated that plaintiff suffered from panic attacks, severe anxiety, and was "unable to handle stress."

Although defendant did not offer part-time sales representative positions, defendant altered plaintiff's job requirements, including the requirements under the second sales program, to accommodate her part-time wok status. Under the adjusted sales program (the "third sales program"), plaintiff was required to: (1) report to the office two times per week on Mondays at/before 1:00 p.m. and Thursdays at/after 11:30 a.m.; (2) hand in a weekly log sheet of activity

6

indicating the number of cold calls and telephone calls plaintiff made each day, and a list of appointments; (3) make at least 15 calls per day; (4) make one contact per day; (5) make at least two appointments each week; (6) bring in one to three new accounts per month; and (7) fill orders for five additional employees at new accounts. Plaintiff alleges that in light of her anxiety and depression, she requested that she be excused from daily reporting to the office, to work at a closer office, and to make phone calls from home. According to plaintiff, each of these requests was denied.

Plaintiff was terminated from her employment with defendant on November 2, 2009. Defendant contends that her termination was the result of failing to make any new sales from June 1, 2009, through November 1, 2009, despite being under the third sales program.

## DISCUSSION

**A.     Legal Standard**

A movant is entitled to summary judgment pursuant to Fed. R. Civ. P. 56 when the moving papers and affidavits show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum–Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Green v. Carlson, 826 F.2d 647, 651 (7th Cir. 1987).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

**B.    Analysis**

    **1.    Count II**

Defendant argues that Count II – which alleges a hostile work environment claim grounded in Kelly's sexually offensive comments – fails because "the sporadic, derogatory remarks alleged by Garner do not," as a matter of law, "create an objectively hostile work environment." An employer "violates Title VII when 'discrimination based on sex . . . create[s] a hostile or abusive work environment.'" Adusumilli v. City of Chicago., 164 F.3d 353, 361 (7th Cir. 1998) (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986)). To establish a prima facie case of sexual harassment under Title VII, plaintiff must demonstrate that: "1) she was subjected to unwelcome harassment; 2) the harassment was based on her sex; 3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere; and 4) there is a basis for employer liability." Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781, 788 (7th Cir. 2007).

To be actionable, the harassment must be so severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment. Id. The

8

harassing conduct need not be both severe and pervasive, Cerros v. Steel Tech., Inc. (Cerros II), 398 F.3d 944, 950 (7th Cir. 2005), as conduct that is not particularly severe but is an incessant part of the working environment may be pervasive enough to meet the standard for liability. Jackson v. County of Racine, 474 F.3d 493, 499 (7th Cir. 2007). The threshold for plaintiff is high, since "[t]he workplace that is actionable is one that is 'hellish.'" Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997). The hostile and abusive nature of a work environment is judged on both an objective and subjective standard. Accordingly, a work environment cannot be described as "hostile" for purposes of Title VII unless plaintiff subjectively found it hostile and a reasonable person would also find it to be hostile. Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807 (7th Cir. 2000); see also Kriescher v. Fox Hills Golf Resort and Conference Ctr., 384 F.3d 912, 915 (7th Cir. 2004).

Defendant does not dispute that Kelly's sexual comments and gestures were unwelcomed by plaintiff or that she subjectively believed that her work environment was hostile. Instead, defendant argues that plaintiff fails to raise a triable issue of fact as to whether the work environment was objectively hostile. In determining whether plaintiff's work environment was objectively offensive, a court may consider factors such as the frequency and severity of the conduct, whether it is physically threatening or a mere utterance, and whether it unreasonably interferes with the employee's work responsibilities. Hilt–Dyson v. City of Chicago, 282 F.3d 456, 463 (7th Cir. 2002). The six sexual comments discussed above, viewed objectively, do not constitute a hostile working environment.

Five of the six sexual comments/gestures were merely made in plaintiff's presence, directed to a group of sales representative of which plaintiff was a part of. While these

9

comments/gestures were crude and inappropriate, they did not involve physical contact, intimidating words or acts, or uninvited sexual solicitation. See Cosby v. Walsh Const. Co., No. 06-C-6188, 2009 WL 1010769, at *4 (N.D. Ill. April 13, 2009) (holding that coworker's comment about receiving a blow job, said in plaintiff's presence, was not objectively intolerable); see also Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) ("the occasional vulgar banter, tinged with sexual innuendo, of coarse and boorish workers" is not pervasive or offensive enough to be actionable).

In addition, the evidence establishes that the sexual comments were not pervasive. In the nearly seven years plaintiff worked for defendant, she has identified only six sex-related comments/gestures, made at the occasional sales meetings and blitzes only. The evidence establishes that plaintiff and Kelly were not assigned to the same office locations, and even if plaintiff worked with Kelly 23 to 28 times a year, as she alleges, there is no evidence that Kelly made offensive statements each time, or even most of the time, they worked together. In fact, the very nature of plaintiff's job did not require her to be at an office location much of the time she spent working. As such, Kelly's comments did not create a workplace that was hellish or objectively intolerable. Nor has plaintiff submitted any evidence that Kelly's behavior interfered with her work responsibilities or altered the conditions of her employment.

There is also no evidence that the inappropriate behavior was based on plaintiff's sex. It is undisputed that Kelly, a female, directed all but one of her comments to a group of sales representatives that often included both males and females, and not to plaintiff exclusively or women generally. In fact, some of Kelly's comments, while vulgar and inappropriate, were about herself and her own actions. Although Kelly made one comment about plaintiff, it was

10

made in the presence of another female coworker, and there is no evidence that her actions were motivated by plaintiff's gender. Nor is there any evidence that Sparkman and Seeman's alleged inaction or threats were the result of plaintiff's sex. Most significantly, plaintiff testified that she did not believe she was being treated differently at work because of her gender. Because the evidence is insufficient to establish an objectively abusive work environment caused by plaintiff's gender, the court grants defendant's motion for summary judgment as to Count II.

## 2. Count III

Count III of plaintiff's complaint alleges that defendant retaliated against her on the basis of both her disability and the complaints she made about Kelly's offensive comments. Both Title VII and the ADA prohibit employers from retaliating against employees who have engaged in an activity protected by the act. 42 U.S.C. § 2000e–3(a); 42 U.S.C. § 12203(a). A plaintiff may pursue a retaliation claim by presenting either direct or indirect evidence. Boumedhi v. Plastag Holdings, LLC, 489 F.3d 781, 788 (7th Cir. 2007). Plaintiff appears to have elected to proceed under the direct method. Under this method, a plaintiff must show that "(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; (3) there is a causal link between the protected activity and the adverse action." Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1038 (7th Cir. 1998). If plaintiff establishes these elements, the burden shifts to the defendant to provide a non-invidious reason for the adverse action. Id. at 1038-39. If a legitimate reason is produced, to prevail plaintiff must prove this reason is pretextual. Id. at 1039.

Plaintiff argues that her "evidence is straightforward." According to plaintiff, she had "good sales" from 2003 to 2006, but when she began complaining about Kelly's behavior and

11

comments to Sparkman in 2006, she was placed on sales probation and her office location was changed from Bensenville to Chicago/North Pulaski, requiring a longer commute. With respect to the alleged retaliation on the basis of her disability, plaintiff contends that in August 2007 she "complained of anxiety and depression to Sparkman," and thereafter was transferred to the Chicago/North Pulaski office.[5]

Defendant argues that Count III fails because plaintiff cannot establish any of the three elements of a prima facie case of retaliation under the direct method of proof.[6] Defendant first argues that plaintiff did not engage in protected activity by complaining to Sparkman about Kelly's comments or her anxiety and depression.

Plaintiff testified that she complained to Sparkman following each of Kelly's offensive comments. However, her complaints were not that "she was discriminated against because of

---

[5] Plaintiff's complaint appears to allege that defendant engaged in numerous adverse actions, including ultimately terminating her, in retaliation for engaging in protected activity. However, plaintiff's response brief seems to abandon these additional arguments, focusing instead on her office reassignment. Nevertheless, had plaintiff proceeded with these additional allegations of adverse action, they too would have failed for the reasons discussed below.

Defendant argues that the office reassignment cannot be the basis of plaintiff's retaliation claim because it occurred more than 300 days before plaintiff's first EEOC charge. "In Illinois, a complainant must file a charge with the EEOC within *300 days* of the alleged discriminatory act and failure to do so renders the charge untimely." Filipovic v. K & R Exp. Sys., Inc., 176 F.3d 390, 396 (7th Cir. 1999) (emphasis included). While the court agrees, and plaintiff does not dispute, that a retaliation claim based on plaintiff's office reassignment is likely untimely (plaintiff was reassigned offices in October 2007 and filed her first charge with the EEOC on October 30, 2008), as discussed below, the claim also fails on the merits.

[6] Defendant also challenges plaintiff's ability to establish a prima facie case under the indirect method of proof. However, because plaintiff has decided to proceed under the direct method, the court does not address defendant's arguments regarding the elements of plaintiff's claim under the indirect method.

12

sex or gender, which is what Title VII requires." Sitar v. Indiana Dept. of Transp., 344 F.3d 720, 727 (7th Cir. 2003) (internal quotations omitted). Instead, as plaintiff testified, she complained that she "did not appreciate [Kelly's] racial remarks," that the racial and sexual comments were "offensive," "obnoxious," and "unprofessional." While plaintiff also sporadically referred to Kelly's comments as "abusive," she never indicated to Sparkman or Seeman that "her [gender] is an issue." Sitar, 344 F.3d at 727. In fact, as discussed above, plaintiff testified that she did not believe she was being treated differently because of her gender. Plaintiff's complaints about Kelly, therefore, did not invoke any action protected by Title VII. Accordingly, plaintiff's retaliation claim with respect to the alleged sexual harassment fails as a matter of law.

Likewise, plaintiff merely "complain[ing] of anxiety and depression to Sparkman," does not amount to her engaging in an activity protected by the ADA. Plaintiff, however, did testify that in August 2007 she requested that Sparkman adjust her work requirements under the first sales program in light of her depression and anxiety, requesting to "have some leeway, work from home, make calls, do anything," and "put aside [the sales program] for a while." According to plaintiff, Sparkman refused to provide her with these accommodations. While this request might in fact have been a protected activity under the ADA, plaintiff has failed to establish the remaining two elements of her prima facie case.

Plaintiff contends that her office reassignment, and corresponding sales territory change, was an adverse employment action, as evidenced by her longer commute and lack of office supplies at the Chicago/North Pulaski office. The court disagrees. An adverse employment action is one that significantly alters the terms and conditions of the employee's job, Stutler v. Ill. Dep't of Corr., 263 F.3d 698, 703 (7th Cir. 2001), which neither of these did. To begin,

plaintiff's longer commute was merely an inconvenience. See Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004) (holding that longer commute did not transform office relocation into an adverse employment action), as was having to share an office space and computer. Plaintiff has not directed the court to any evidence that the change in office location and sales territory altered her work responsibilities or that her "compensation, fringe benefits, or other financial terms of employment" were diminished. See O'Neal v. City of Chicago, 392 F.3d 909, 911 (7th Cir. 2004) (discussing three general categories of materially adverse employment actions). Although defendant alleges that plaintiff's new sales were inadequate between 2007 and 2009, part of which time she was assigned to the new territory, plaintiff argues that she did in fact make adequate sales during these years. Thus, any argument plaintiff may have that the new sales territory was less lucrative is negated.

Even assuming *arguendo* that plaintiff's office transfer was an adverse employment action, plaintiff has not established a casual connection between the protected activity she engaged in and her office reassignment. Plaintiff alleges that she requested an accommodation in early August 2007 and in retaliation she was transferred to the Chicago/North Pulaski office in October 2007. Timing alone, however, rarely creates a fact issue. Nehan v. Tootsie Roll Indus., Inc., No. 14-2842, 2015 WL 5116876, at *4 (7th Cir. Sept. 1, 2015). In light of the fact that two months passed between the protected activity and her office reassignment, "additional proof of a casual nexus is necessary" to overcome defendant's motion. Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998); see also O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011) (two month gap between protected activity and adverse employment action "not strongly suggestive of retaliation"). Plaintiff, however, has not directed the court to any

14

additional evidence to support such a link. Accordingly, plaintiff's retaliation claim pursuant to the ADA fails as a matter of law.

### 3. Count IV

Finally, plaintiff alleges that defendant violated the ADA by refusing to accommodate her disability – stress and anxiety – by allowing her to "make calls from home" and "be assigned to a closer office" to her home. Defendant argues, among other things, that Count IV fails because plaintiff is not disabled as a matter of law. To establish a violation of the ADA, an employee must show: "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." Stevens v. Ill. Dep't of Transp., 210 F.3d 732, 736 (7th Cir. 2000) (internal citations omitted). The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1).

As evidenced by section 12102(1), plaintiff incorrectly relies solely on her doctor's FMLA certification – which indicated that she suffered from panic attacks, severe anxiety, and was "unable to handle stress," – to establish her having a disability under the ADA. Although plaintiff has failed to identify how her anxiety and stress limits a major life activity in her response brief, plaintiff testified that she required the requested accommodations because the longer commute to the Chicago/North Pulaski office aggravated her stress and anxiety. The Seventh Circuit, however, has held that "driving is not, in itself, a major life activity." Winsley v. Cook County, 563 F.3d 598, 603 (7th Cir. 2009). While an inability to drive could create a disability if it impaired an individual's ability to work, id., plaintiff has not alleged that she could

15

not drive, but merely that she wanted a shorter drive. Accordingly, plaintiff has not established that she has a disability within the meaning of the ADA.

Even assuming *arguendo* that plaintiff has a disability within the meaning of the ADA, the uncontested evidence establishes that defendant provided plaintiff with a reasonable accommodation. "An employer is not obligated to provide an employee the accommodation he requests or prefers." Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996). Instead, an employer need only provide some reasonable accommodation. Id. The ADA defines "reasonable accommodation" to include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies . . . and other similar accommodations." 42 U.S.C. § 12111(9).

In September 2009, plaintiff provided defendant with a doctor's note indicating that she suffered from panic attacks and severe anxiety, and as a result could only work part-time. It is undisputed that in light of the doctor's note defendant reduced, by half, each of plaintiff's responsibilities under the second sales program. Under this adjusted sales program, plaintiff was required to report to the office twice a week (as opposed to five days a week), make 15 sales calls a day (as opposed to 30), make one contact per day (as opposed to three), make two appointments per week (as opposed to four), bring in one new account a month (as opposed to three), and fill orders for five employees at new accounts (as opposed to ten). In addition, plaintiff was no longer required to report to the office at peak rush-hour times, which Seeman testified was meant to accommodate her complaints about traffic.

Although plaintiff would have preferred to not have had to report to the office at all, the court will not second-guess what defendant reasonably believed was necessary to plaintiff's job. Seeman testified that all employees under a sales program are required to report to their assigned office location once a day to receive assistance with increasing their sales. At the time plaintiff requested an accommodation she was under her second sales program, and therefore was required to make daily office visits. Nonetheless, to accommodate plaintiff's disability, defendant altered this requirement to twice a week and adjusted the times of day at which she was required to report to the office. This was a reasonable accommodation under the ADA.

Similarly, defendant was not required to reassign plaintiff to another office location because "one's commute to work falls outside the scope of his or her job." Kimble v. Potter, No. 06-C-2589, 2009 WL 2045379, at *7 (N.D. Ill. July 13, 2009). Moreover, plaintiff has not presented any evidence that there was a vacancy at another office location that would have permitted defendant to reassign her to an office closer to her residence. Gile, 95 F.3d at 499. Consequently, the court grants defendant's motion for summary judgment as to Count IV as well.

## CONCLUSION

For the foregoing reasons, the court grants defendant's motion for summary judgment and enters judgment in favor of defendant Clearstaff, and against plaintiff Garner.

**ENTER:** December 1, 2015

_Robert W. Gettleman_
**Robert W. Gettleman**
**United States District Judge**